W. J. USERY, Jr., Secretary of Labor, U. S. Department of Labor, Plaintiff,

v.

PARAMOUNT CITRUS ASSOCIATION, INC., Defendant.

Ray MARSHALL, Secretary of Labor, U. S. Department of Labor, Plaintiff,

v.

SANTA CLARA PRODUCE, INC., Defendant.

Civ. Nos. 76–1544–WMB, 77–1898–WMB.

United States District Court, C. D. California.

Feb. 15, 1979.

John M. Orban, Associate Regional Sol., Marshall P. Salzman, U.S.Dept. of Labor, Los Angeles, for plaintiff.

Leon L. Gordon, J. Richard Glade, Los Angeles, Cal., Dressler, Stoll & Jacobs, Newport Beach, Cal., Scott A. Wilson, Oxnard, Cal., for defendants.

## MEMORANDUM ORDER

WM. MATTHEW BYRNE, Jr., District Judge.

The Secretary of Labor seeks to enjoin the defendant packing shed operators, Paramount Citrus Association and Santa Clara Produce, Inc., from violating the Farm Labor Contractor Registration Act of 1963 ("FLCRA"), 7 U.S.C. § 2041 *et seq.* The cases were tried separately to the Court on stipulated facts. The issues are nearly identical and the Court has therefore consolidated the cases for purposes of this order.

The sole issue in each case is whether the defendant is a "farm labor contractor" within the meaning of section 3(b) of the FLCRA, 7 U.S.C. § 2042(b), and thus subject to the registration provisions of that act. That section states, in pertinent part:

"As used in this chapter—

(b) The term 'farm labor contractor' means any person who, for a fee, either for himself or on behalf of another person, recruits, solicits, hires, furnishes, or transports migrant workers (excluding members of his immediate family) for agricultural employment. Such term shall not include—  .  .  .

(2) any farmer, processor, canner, ginner, packing shed operator, or nurseryman who personally engages in any such activity for the purpose of supplying migrant workers solely for his own operation  .  .  .."

7 U.S.C. § 2042(b).

The Court finds that both Paramount Citrus and Santa Clara Produce recruit, hire and transport for agricultural employment persons who are "migrant workers" within the meaning of section 3(g) of the FLCRA. *See* 7 U.S.C. § 2042(g) (defining "migrant worker"). The Court further finds that defendants are packing shed operators within the meaning of section 3(b)(2). The controversy centers on whether these packing shed operators "personally" recruit, hire and transport migrant workers, and whether they do so "solely for [their] own operation[s]," so as to be excluded from the definition of a "farm labor contractor."

1. *The meaning of "personally" under section 3(b)(2)*

The FLCRA was enacted in 1963 and amended in 1974. The only change made by the 1974 amendment to section 3(b)(2) was the addition of the word "personally." The Secretary urges that the requirement that packing shed operators "personally" engage in the recruiting, hiring and transportation of migrant workers to be eligible for the section 3(b)(2) exclusion means that the exclusion is applicable only to individual proprietors and not to corporations. The Secretary contends that, because Paramount Citrus and Santa Clara Produce are corporations, they cannot claim

to be excluded from the FLCRA's registration requirements by section 3(b)(2). The Court disagrees.

The legislative history of the 1974 amendments to the FLCRA demonstrates how the word "personally" came to be included in section 3(b)(2). One purpose of the amendments was to improve the ineffective enforcement mechanisms provided by the 1963 act. Senate Report No. 93–1295, 4 U.S. Code Cong. & Admin.News 1974, pp. 6441, 6445. One defect in the prior enforcement mechanism was "the absence of any requirement that those who benefit from the work of migrant laborers assume responsibility for engaging only registered farm labor contractors." *Id.* at 6443. Congress's efforts to include such a requirement in the 1974 amendments led to the addition of the word "personally" to section 3(b)(2).

Senate Committee Report No. 93–1206, dated October 1, 1974, contains a proposed amendment to the FLCRA that would have divided section 3(b)(2) into two subparts:

"(2) any farmer, processor, canner, ginner, packing shed operator, or nurseryman (A) who personally engages in any such activity for the purpose of supplying migrant workers solely for his own operation; or (B) who indirectly engages in any such activity through an agent or by contract, where he first determines that the person so engaged possesses a certificate from the Secretary that is in full force and effect at the time he contracts with such person so engaged. . . ."
(amendment underscored)

The word "personally" in the proposed amendment is used to distinguish an operator directly engaged in recruiting, hiring and transporting migrant workers from an operator indirectly—that is, through an agent or by contract—so engaged. The proposed amendment was clearly not intended to make the applicability of the exclusion depend on whether the operator was an individual proprietor or a corporation.

The amendment proposed in Senate Committee Report No. 93–1206 was not adopted as written. Instead, section 4(c) was added to the FLCRA:

"No person shall engage the services of any farm labor contractor to supply farm laborers unless he first determines that the farm labor contractor possesses a certificate from the Secretary that is in full force and effect at the time he contracts with the farm labor contractor." 7 U.S.C. § 2043(c).

The language is virtually identical to that contained in the Senate Committee Report's proposed amendment to section 3(b)(2). Congress apparently decided that a direct prohibition of recruiting and hiring of migrant workers through unregistered contractors was preferable to enforcement through denial of the section 3(b)(2) exclusion. When the language was transferred to section 4(c), however, the word "personally" was not deleted from section 3(b)(2). Although the legislative history of the 1974 amendments provides a thorough explanation of the purpose and meaning of each other change in the FLCRA, that history offers no indication that the addition of the word "personally" to section 3(b)(2) was intended to modify the scope of the exclusion. *See* Senate Report No. 93–1295, 4 U.S.Code Cong. & Admin.News 1974, p. 6441 *et seq.*

The Secretary contends that his interpretation of "personally" is consistent with Congress's determination in 1974 that agriculture is no longer a "ma and pa" business. Indeed, the Senate Report states that "[t]he small family farm, though still many in number, has been effectively replaced because of productivity by large commercial operations." 4 U.S.Code Cong. & Admin.News 1974, p. 6442. There is no suggestion in the Report, however, that this advent of "agribusiness" compelled any narrowing of the section 3(b)(2) exclusion. One of the major purposes of the amendments was to further protect the supply of agricultural labor to "the primary users of such labor." *Id.* With the advent of large commercial farming operations, the "primary users" clearly include farming and processing corporations. Neither the FLCRA nor its legislative history indicate that the 1974 amendments were designed to give more protection to individual proprie-

tors than to corporations, or to distinguish one from the other for purposes of any exclusion from the FLCRA's registration provisions.

■ The Court's conclusion that the word "personally" does not preclude corporations from claiming the section 3(b)(2) "exclusion by the language" of the surrounding provisions of the FLCRA. Section 3(a) defines "person" to include a corporation. 7 U.S.C. § 2042(a). Section 3(b)(3) refers to "any full-time or regular employee of any entity referred to in . . . [section 3(b)(2)] . . . ." 7 U.S.C. § 2042(b)(3). The use of the word "entity" in reference to section 3(b)(2) clearly indicates that corporations as well as individuals may qualify for that section's exclusion.

■ The legislative history of the 1974 amendments to the FLCRA demonstrate that the word "personally" in section 3(b)(2), to the extent it was intended to have any meaning, was used to mean "directly." There is no indication in the FLCRA or its legislative history that "personally" was intended to preclude a corporation from claiming· an exclusion under section 3(b)(2). The Court therefore concludes that both Paramount Citrus and Santa Clara Produce "personally" engage in the recruiting, hiring, and transportation of migrant workers within the meaning of section 3(b)(2) of the FLCRA. 7 U.S.C. § 2042(b)(2).

2. *"Solely for his own operation"*

The term "farm labor contractor" does not include any packing shed operator who personally recruits, hires and transports migrant workers "solely for his own operation." 7 U.S.C. § 2042(b)(2). An interpretation and application of the phrase, "solely for his own operation," depends upon the relationship between the policy underlying the FLCRA and the operations of the defendant packing shed operators.

■ The purpose of the FLCRA is to regulate middlemen who exploit migrant workers, farmers, processors and packers. Section 2 of the FLCRA provides in part:

"The Congress hereby finds that the channels and instrumentalities of interstate commerce are being used by certain irresponsible contractors for the services of the migrant agricultural laborers who exploit producers of agricultural products, migrant agricultural laborers, and the public generally . . . ." 7 U.S.C. § 2041(a).

Senate Report No. 93–1295, discussing the background of the 1963 legislation, states:

"Although the specific functions of the farm labor contractor, often called a 'crew leader' or 'crew pusher', might vary from job to job, his role essentially remains the same—the bridge between the operator and the worker. In many instances, the contractor is not only the recruiter, hirer, and transporter, but acts as the supervisor, foreman, and paymaster as well. . . . In the vast majority of cases, the crew leader is not only the link between the worker and the grower, but also acts as an intermediary with the non-farming community as well. . . ." 4 U.S.Code Cong. & Admin. News 1974, p. 6442.

The Senate clearly intended to protect farmers and packers as well as migrant workers. The Senate Report states that "[t]he contractor's unchallenged bargaining position is clearly one of detriment to both the farmworker and operator." *Id.* The Department of Labor's interpretation of section 3(b)(2) confirms this view:

"The Act was intended to regulate the practices of all persons functioning in the capacity of middlemen between the farmer, processor, etc., and the migrant worker. Thus, the exclusion applies only in those situations where the normal functions of the middleman are performed by the farmer, processor, etc., solely for himself and should any of these persons perform in the role of middleman such as where the activities are in behalf of other employers, producers, processors, etc., in addition to himself, the exclusion would not apply." 29 C.F.R. § 41.17.

The determinative question in these cases is whether defendants' recruiting, hiring and

transportation of migrant workers was done in the capacity of middlemen between the workers and growers or for their own operations.

■ Migrant workers are not employed in the processing or packing operations of a packing shed operator. They are employed to harvest and haul crops. However, Congress clearly intended the section 3(b)(2) exclusion to ·apply, under certain circumstances, to packing shed operators who employ migrant workers for their own operation. Were the Court to conclude that the "operation" of a packing shed operator for purposes of section 3(b)(2) is confined to the processing and packing operations, the exclusion would be rendered meaningless. Further, such an interpretation would disregard the realities of the operation of a packing shed business. Instead, the Court must determine whether the hiring in a particular case is done for harvesting that is part of the packing shed operator's own operation or for harvesting that is done by the grower, using the packing shed operator as a middleman to supply migrant workers.

The Secretary of Labor relies on 29 C.F.R. § 41.17, which reads in part as follows:

"If a processor solicits, recruits, hires, furnishes, or transports migrant workers to be used in the harvesting of crops which he has in fact purchased through a contract with the farmer, and under whose contractual terms title to the crop is vested in the processor before the crop has been harvested, the exemption would apply, because the processor would be supplying migrant workers solely for his own operation. Where the processor or any other person acts as a conduit through whom the migrant workers are made available to third parties, even though the crops on which the migrant workers are employed are the subject matter of a contract to purchase (as distinguished from a contract of sale) and will be used in the processing, canning, etc., the exemption does not apply."

The regulation adds nothing to the Court's consideration of the problem in these areas.

The first sentence is superfluous, because if the processor had purchased the crops prior to harvest he would be a farmer engaged in hiring migrant workers for his own harvesting operation and clearly entitled to the section 3(b)(2) exclusion. The second sentence merely restates the problem of whether the processor is in fact acting as "a conduit through whom the migrant workers are made available to third parties," and notes that a processor may be a "conduit" even when the crops are the subject of a contract to purchase (although he could not be where the crops are the subject of a contract of sale). The regulation does not state that title to the crops at the time of harvest is determinative of the section 3(b)(2) issue. To the extent that it could be so interpreted, it has been explicitly disapproved by Congress:

"The Committee wishes to clarify the phrase, 'solely for his own operation' as used in section 3(b)(2) of the Act. The Committee intends that the application of this provision shall not necessarily depend on where title to the commodities involved rests at the time, but shall in the future depend on a full consideration of the economic realities of agricultural production and processing." S.Rep.No.93–1295, *supra* at 6447.

■ ·The "economic realities of agricultural production and processing" include a wide range of circumstances, among them considerations of economy of operation, competitive influences, financial risks, and the prevalent practices in a given agricultural community. No one of these considerations should be determinative in itself, but they are guideposts to be used in determining whether a given operator's hiring of migrant workers is done for his own operation or as a middleman. The Court turns now to a consideration of the economic realities of each of the defendants' operations.

## A. *Paramount Citrus Association*

■ The stipulated facts in No. 76–1544 include the following:

"B. [Paramount Citrus] at its Escondido packinghouse is engaged in the business

of harvesting, hauling, packing, shipping, and marketing citrus fruits. . . .

D. The agricultural workers employed by the defendant pick citrus fruits of growers whose fruit is packed, shipped, marketed, and/or processed by the defendant under the terms of a contract entered into between the defendant and said growers. The defendant at no time takes title either to the land upon which the agricultural employees work or the crops which they pick.

I. The Escondido packinghouse is the employer of the agricultural workers in question; it pays their wages, makes deductions, and pays all taxes required by law, supervises and controls them, and assumes all the obligations of the employer-employee relationship. It provides these employees with a major medical plan which includes medical and hospital insurance and life insurance which carries double indemnity benefits.

J. Said packinghouse maintains buses and provides transportation for these workers to and from the orchards where they are employed.

K. Said employer picks and packs the fruit of its grower members under the terms of a contract which requires said packinghouse to pick the fruit, haul it to the packinghouse, pack it, market the saleable fruit, and divert the unsaleable part to the processing plant in San Fernando. Defendant charges the growers with whom it contracts for the picking of the crops and the hauling away of the crops performed by its agricultural employees. . . .

L. Some of the growers with whom the defendant contracts pick their own fruit.

. . .

P. In the area in which the Escondido packinghouse competes, it is customary for all citrus packinghouses to harvest the citrus fruits which they pack.

Q. The defendant does not pick or haul any fruit other than that which is packed or processed in its own packing or processing plants."

The facts demonstrate that Paramount Citrus is a packing shed operator that employs migrant agricultural workers to harvest crops that it has contracted to harvest, pack and sell. It harvests only those crops that it has contracted to pack or process in its own plants. It is customary in the region in which Paramount Citrus operates for a packing shed operator to harvest the citrus fruit that it processes and packs. Paramount Citrus does not supply migrant workers to any other employer. On the basis of these facts, the Court concludes that Paramount Citrus engages in the recruiting, hiring and transportation of migrant workers "solely for [its] own operation."

B. *Santa Clara Produce, Inc.*

The stipulated facts in No. 77–1898 include the following:

(C) 1. [Santa Clara Produce] engages in the growing, harvesting, packing, shipping, and selling of fresh market vegetables and will harvest, pack and sell for those growers that wish to deal with Defendant. . . .

4. Defendant, for all crops which it harvests, determines when the last irrigation will be made at the farm.

5. Defendant determines when the crop will be harvested. Defendant bases this determination on crop ripeness, its packing schedule and market conditions.

7. Defendant manages all aspects of the harvest operations and provides all necessary harvesting equipment and vehicles to harvest the crop and transport it to the defendant's packing shed.

8. If a crop harvested by defendant is lost between the harvest and its receipt at the packing shed, defendant credits the grower with the amount said crop would have earned had it been delivered and sold. Defendant therefore bears the risk of loss of the crop after it is harvested.

9. Defendant determines the planting dates for the crops it will harvest for Santa Clara Farms (45% group) and for the written contract growers (28% group).

10. Defendant determines the variety of seed and provides such seed for the crops it will harvest for Santa Clara Farms . . ., the written contract growers . . ., and the financed growers . . . ."

■ The Court finds that Santa Clara Produce is a packing shed operator that employs migrant agricultural workers to harvest crops that it has contracted to harvest, pack and sell. Santa Clara Produce appears to harvest only those crops that it has contracted to pack and sell. It exerts substantial control over the planting and care of the crops, and it completely controls the harvesting process itself. Santa Clara Produce bears the risk of any loss incurred after the crops are harvested. The Court concludes that Santa Clara Produce engages in the recruiting, hiring and transportation of migrant workers "solely for [its] own operation."

### 3. *Conclusion*

Paramount Citrus and Santa Clara Produce are ongoing concerns that employ migrant workers to harvest and haul crops that the companies have contracted to harvest, process, pack and sell. They are not the kind of middlemen between migrant workers and agricultural operators that Congress intended to regulate. Paramount Citrus and Santa Clara Produce are not "farm labor contractors" within the meaning of section 3(b)(2) of the FLCRA and are therefore not subject to the registration requirements of section 4 of that act.

The foregoing will be considered findings of fact and conclusions of law. Judgment will be entered in favor of the defendants in No. 76–1544–WMB and No. 77–1898–WMB.